**Willine P. TAYLOR**

v.

**SOUTHERN UNIVERSITY OF NEW ORLEANS.**

**Civ. A. No. 82–1196.**

United States District Court, E.D. Louisiana.

Jan. 10, 1983.

Ernest Lee Caulfield, New Orleans, La., for plaintiff.

Nadine M. Ramsey, New Orleans, La., for defendant.

BEER, District Judge.

This matter came on for trial before this Court on December 3, 1982. Thereafter, both parties requested time in which to file proposed findings of fact and conclusions of law. Those proposals along with appropriate memoranda have been filed and considered. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are also so adopted.

## FINDINGS OF FACT

1. Plaintiff Willine P. Taylor was hired as an English instructor at Southern University in New Orleans on September 3, 1961. She received various academic promotions, becoming, in 1967, a Professor of English. From January 1975 through January 1977, she assumed duties as Chairperson of the Division of Humanities, and continued in that position until January of 1981, when she resigned.

2. Her resignation was accepted by Dr. Asa Sims, Dean of Academic Affairs, on January 23, 1981. On January 30, 1981, plaintiff sought to withdraw her resignation. Her request was denied by Dr. Sims. Thereupon, various faculty members in the Division of Humanities prepared a statement in her behalf which was forwarded to the University Chancellor, Dr. Emmett Bashful. The Chancellor responded, stating that plaintiff had resigned on other occasions and that each time the administration had agreed to reinstate her, but that it declined to do so on this occasion.

3. Thereafter, a Search Committee was organized whose purpose was to recommend for appointment persons qualified for the vacated position of Chairperson of the Division of the Humanities; the Chancellor having ultimate responsibility for the selection. Meanwhile, Dr. Roscoe Reddix was named as Acting Chairperson of the Division.

4. The Search Committee met on various occasions between October of 1981 and February of 1982. The Committee prepar-

ed a job description and established criteria for reviewing the qualifications of applications received. These criteria included an earned doctorate in one of the disciplines of the Humanities. The committee received and reviewed the applications of plaintiff, Dr. Roscoe Reddix and Dr. Gloria Adams, the only persons to submit completed applications. Dr. Mildred Felix also submitted an application for the position, but her application was not considered because it was deemed to be incomplete.

5. The three applicants noted above satisfied the initial criteria. Sometime during this process, it became apparent that plaintiff was the only applicant who possessed "an earned doctorate in one of the disciplines of the humanities." The Committee, however, determined on its own initiative that the applicants were qualified to be considered. Dr. Adams and Dr. Reddix had earned doctorates in other disciplines, and each taught courses in the humanities.

6. The applicants were interviewed individually by the Committee. The applicants were asked basically the same questions, and a rating was assigned to each applicant by each committee member. Sex played no part in the committee's consideration of the applications. After the interviews, scores were tallied by a member of the Committee. Plaintiff's cumulative score was the lowest of the three applicants; Dr. Reddix had the highest.

7. The Committee recommended Dr. Reddix to the Dean of Academic Affairs. However, the Committee was again instructed to list the applicants who were qualified, consistent with the original instructions. This was done, and all three names were subsequently forwarded to the Chancellor for his final selection.

8. Dr. Gloria Adams was selected by the Chancellor to become Chairperson of the Division of Humanities. The Chancellor did not believe that plaintiff was the most capable individual to head the Division of Humanities. He took into consideration the fact that plaintiff had resigned and/or expressed an intent to resign on other occasions. Further, he did not believe that plaintiff was the most capable of carrying out the university's policies or of cooperating with other members of the administration.

9. Plaintiff has retained her position as professor of English and continues in that capacity, being among the highest paid faculty members in a non-administrative position at the university.

10. It is within the administration's discretion to accept or reject tendered resignations. Plaintiff's resignation was accepted because of a history of prior resignations and/or statements by plaintiff of intent to resign, which the university attempted to work out with plaintiff. The decision of the administration to accept plaintiff's resignation and to decline to reinstate her was not based in any way upon considerations of gender.

11. Plaintiff alluded to other instances in which male faculty members had tendered resignations as Chairpersons. The action taken by the administration with regard to these resignations was consistent with university policy.

12. Plaintiff alleges a history of harassment by the administration including instances of not being provided travel funds to attend professional meetings when male faculty members were provided such funds; and an instance of plaintiff having requested a recuperation leave which was denied by the Baton Rouge campus. Thereupon, plaintiff was obliged to use her accrued leave time under a different university policy.

13. After plaintiff became Chairperson of the Humanities Division in 1977, she attended meetings at which she claims she was subjected to verbal abuse and harassment because of her questions concerning policy. Plaintiff complained to the Chancellor on several occasions, but avers that nothing resulted. She contends that male members of the Humanities Division were not subjected to the same form of abuse and harassment. Further in this regard she contends that in January of 1981 she made reference to a letter from Dr. Gladys Miller,

Chairperson of the English Department, complaining about the policy which required that department heads teach the same number of hours as others in the department. Plaintiff expressed her concurrence with this complaint. Words were exchanged, and plaintiff left the meeting. Shortly thereafter she resigned.

14. Plaintiff, while essentially carrying out university policies has very freely and unreservedly criticized and disputed those policies. While the university evaluations of plaintiff's abilities as an administrator and a teacher reveal that plaintiff has performed satisfactorily in each capacity, it is also apparent that considerable friction has been the hallmark of plaintiff's administrative relationship with the university leadership.

## CONCLUSIONS OF LAW

■ 1. Following *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), plaintiff has the burden of proving a prima facie case of discrimination, showing that she (1) belongs to a protected group or minority; (2) was qualified for the position from which she was suspended or not rehired; (3) was terminated; and (4) after termination, the employer hired a person not in her protected class. *McDonnell Douglas Corporation v. Green, supra; Whiting v. Jackson State University,* 616 F.2d 116 (5th Cir.1980).

2. The requirements discussed in *McDonnell Douglas* are not the only way of proving a prima facie case of discrimination. *E.E.O.C. v. Brown & Root, Inc.,* 688 F.2d 338 (5th Cir.1982); *Jones v. Western Geophysical Co.,* 669 F.2d 280 (5th Cir.1982). Facts will vary and the test established in *McDonnell Douglas* is not necessarily applicable in every respect to differing factual contexts. Departures from the four requirements are unusual and warranted only where direct proof of discrimination is undisputed in the record. *Daves v. Payless Cashways, Inc.,* 661 F.2d 1022, 1025 n. 5 (5th Cir.1981).

■ 3. When plaintiff has established a prima facie case, the employer must articulate some legitimate, nondiscriminatory reason for the termination by a preponderance of the evidence.

■ 4. Plaintiff is a member of a protected minority, and is, at least, qualified to act as Chairperson of the Division of Humanities. I must next determine whether there was a termination within the meaning of the requirements of *McDonnell Douglas.* It is undisputed that plaintiff was not told or requested to resign as Chairperson. A constructive discharge may be found, however, where an employer has made working conditions so difficult that a reasonable person would feel forced to resign. *Meyer v. Brown & Root Construction Co.,* 661 F.2d 369 (5th Cir.1981). I do not find that a reasonable person in plaintiff's situation would have felt compelled to resign and thus do not find that there was a constructive discharge. Plaintiff herself continues to work at the university as a full time professor of English.

■ 5. Moreover, plaintiff was replaced by a member of her protected minority, who was also qualified to serve as Chairperson of the Division of Humanities. The Search Committee so determined based on a consideration of the totality of each candidate's record and experience. Although the other applicants did not possess an earned doctorate in the humanities, each held a doctorate in another field, and taught in the humanities. The Committee concluded that lack of a humanities doctorate was insufficient to render the others less qualified, and I agree. Here, the proof of discrimination is disputed, and I believe that plaintiff has failed to satisfy her burden of proving a prima facie case of discrimination based upon her gender.

■ 6. Assuming that plaintiff had met this burden, she has also failed to rebut defendant's evidence of a legitimate, nondiscriminatory reason for declining to reinstate her as Chairperson, and for selecting another person as Chairperson. The Chancellor weighed each person's talents and capabilities and determined that another female was more suited to become Chairper-

**338**

son. He took into consideration that plaintiff had resigned and/or stated an intent to resign on other occasions after disputes with members of the administration, and that he therefore did not feel that plaintiff was the most capable of carrying out the university's policies or of cooperating with other members of the faculty and administration. The record supports a basis for this assessment, which was in no way based upon defendant's sex.

Accordingly, judgment is rendered in favor of defendant and against plaintiff, each party to bear its own costs. Defendant is to prepare and submit a judgment consistent with these findings and conclusions.